**Vivian M. MARK, Rebecca A. Meyer, & Carmen Maza, Plaintiffs,**

v.

**The MOUNT SINAI HOSPITAL, Defendant.**

Nos. 97 Civ.1947(CBM), 97 Civ. 4841(CBM) and 98 Civ. 4774(CBM).

United States District Court, S.D. New York.

Feb. 18, 2000.

---

Eugene A. Gaer, Theodore M. Simon, New York City, for Plaintiffs.

Proskauer Rose LLP by Joseph Baumgarten, New York City, for Defendant.

### OPINION GRANTING SUMMARY JUDGMENT

MOTLEY, District Judge.

### OPINION

Following oral argument on December 14, 1999 this court granted defendant's motion for summary judgment, thereby dismissing plaintiffs' case in its entirety. The following outlines the court's reasoning in granting summary judgment.

### BACKGROUND

This case involves claims of breach of contract as well as employment discrimination based on gender, age and national origin. The case involves the consolidated claims of three plaintiffs, Vivian M. Mark, Rebecca A. Meyer and Carmen Maza. The three plaintiffs are female psychologists who were employed by the Communication Disorders Center ("CDC"), a treatment facility owned by the defendant, the Mount Sinai Hospital. The CDC is a treatment center for adults and children with speech and language disorders and learning disabilities. The plaintiffs all voluntarily resigned from their employment at the CDC. In this lawsuit plaintiffs claim that their resignations were constructive discharges. During the relevant time period Arnold I. Shapiro, a speech therapist, served as director of the CDC.

Meyer worked at the CDC from May of 1991 until she resigned in August of 1996. During her employment Meyer served as a clinical psychologist except for the period of July 1995 through May 1996 when she held the position of acting psychology coordinator. Mark worked as a psychologist at the CDC from April of 1992 until October of 1996. Maza worked as a psychologist at the CDC from 1990 to 1998.

All three plaintiffs claim defendant engaged in age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") and the New York State Human Rights Law, Executive Law § 290 *et seq.* ("NYSHR"). Two plaintiffs, Meyer and Maza, allege that defendant engaged in gender discrimination in violation of NYSHR and Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Two plaintiffs, Meyer and Mark, allege defendant breached employment contracts by requiring employees to engage in activities

violative of professional ethics. One plaintiff, Maza, alleges discrimination based on national origin in violation of Title VII and NYSHR. Plaintiff Maza also makes discrimination claims under Administrative Code §§ 8–107(1)(a) and 8–502(a) ("NYCHR").

## STANDARD FOR SUMMARY JUDGMENT

This circuit recognizes the value of summary judgment to expeditiously dispose of meritless litigation. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). The mechanism of summary judgment promotes judicial economy by preventing further litigation on an issue with an unalterably predetermined outcome. The standard for summary judgment ensures that issues are efficiently resolved without compromising the rights of the non-moving party.

> Summary judgment may be granted only if the moving party can show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.

*Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 107 (2d Cir.1998) (internal citations omitted). Thus, the mere existence of a factual dispute between parties does not preclude summary judgment when the dispute is not genuine or when the disputed facts are immaterial. A disputed fact is immaterial when the outcome of the case remains the same regardless of the disputed issue. Factual questions which prove immaterial fail to preclude summary judgment. *See Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986) (noting that the existence of unresolved immaterial issues does not suffice to defeat a motion for summary judgment).

A party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment". *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986).

Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted).

> The possibility that a material issue of fact may exist does not suffice to defeat the motion; upon being confronted with a motion for summary judgment the party opposing it must set forth arguments or facts to indicate that a genuine issue—not merely one that is colorable—of material fact is present.

*Gibson v. American Broadcasting Companies*, 892 F.2d 1128, 1132 (2d Cir.1989).

## DISCUSSION

*Voluntary Resignation or Constructive Discharge*

■ It is undisputed that all three plaintiffs resigned from their employment at the CDC. Plaintiffs seek to have these resignations construed as constructive discharges in a situation permitting an inference of discrimination. Previous court decisions have helped to elucidate at what level of unpleasantry working conditions become so unbearable that voluntarily removing oneself from such employment qualifies as constructive discharge.

In determining whether or not a constructive discharge has taken place, the trier of fact must be satisfied that the working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

*Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2nd Cir.1983) (internal citations omitted).

 Courts have also required plaintiffs to show that the employer wanted the employee to resign and intentionally made the working conditions unpleasant for the purposes of achieving that result. "The employer must have deliberately made an employee's working conditions so intolerable as to force the resignation." *Martin v. Citibank,* 762 F.2d 212, 221 (2nd Cir. 1985) (internal citations omitted). The evidence plaintiffs proffer falls far short of this high standard and could not possibly persuade a reasonable trier of fact. Plaintiffs contend that when each of the three plaintiffs resigned, Shapiro made a notation on her personnel forms that she should not be rehired by the CDC. Plaintiffs argue that this constitutes evidence of an intent by Shapiro to force the plaintiffs to leave the CDC. The timing alone suffices to confound plaintiffs' strained argument. Shapiro made these notations after plaintiffs tendered their resignations. Thus, no reasonable factfinder would deem such notations relevant in evaluating the working environment leading up to plaintiffs' decisions to resign or their employer's alleged intent to encourage their resignations.

 The employment miseries of which plaintiffs complain seem to fall within the unactionable domain of less than ideal working conditions with which employees routinely contend. One of Mark's primary complaints is that she was deprived of a personal office from August of 1996 until she resigned. At that time Mark was told that, due to limited office space, she could no longer have a permanently assigned office but instead would see her patients in whichever office was vacant on a given day. She was provided with a portable filing cabinet in which to store her patient records. Mark complains that wheeling the cabinet from office to office every day was humiliating and constituted a substantial worsening of her working conditions. Mark does not allege that she was ever unable to secure a private room in which to meet with patients or that the portable filing cabinet arrangement compromised the security of confidential patient records. Wheeling a filing cabinet from one office to another does not qualify as a walk of shame such that a reasonable person would quit rather than engage in what plaintiff would have the court deem a gross affront to personal dignity.

 Mark cites a few isolated incidents which she suggests demonstrate harassment and resentment by the director of the CDC. Mark contends that she was subjected to a review of her recordkeeping. Mark admits that the she was not cited for any wrongdoing in her recordkeeping during this review. Mark contends that she was then required to draft a memo averring her understanding of, and intent to continue complying with, CDC recordkeeping policy. Mark does not contend that she was required to confess any wrongdoing in that memo. A review of recordkeeping in which no deficiencies were noted coupled with the extraction of a promise to continue to abide by CDC policy seems innocuous on its face. Mark further cites certain comments allegedly made by Shapiro. Mark alleges that Shapiro called her a "cog in the wheel and the wheel isn't working" Pls.' Mem. of Law in Opp'n to Summ.J. at 7-8. Such statements do not demonstrate that Shapiro held Mark in the highest esteem nor do they demonstrate that he routinely treated her disdainfully on account of her age or gender. Without showing that such criticism was pervasive or that it arose from discrimination based on gender or age, Mark's constructive discharge complaint fails. As a part time

employee, Mark did not usually work on Wednesdays. Mark claims that her attendance was required at staff meetings which were scheduled on Wednesdays. The CDC need not kowtow to the scheduling convenience of one part time employee. Mark does not suggest that attendance at staff meetings represented an unreasonable demand. Mark does not suggest that altering her part time schedule to accommodate the Wednesday staff meetings was untenable. Mark also does not suggest that the CDC held the staff meetings on Wednesdays not for a legitimate business purpose but only to harass her because she was an older woman. Thus, the existence of Wednesday staff meetings does not help build a case of discrimination or constructive discharge. Perhaps the most petty of Mark's complaints is that Shapiro did not introduce her to new CDC employees on several occasions. Such a breach of etiquette is easily rectified with slight initiative on Mark's part and does not advance Mark's claim of constructive discharge in a situation giving rise to an inference of discrimination.

Meyer and Maza also allege facts which are, as a matter of law, inadequate to paint a picture of a work environment which would give rise to a constructive discharge. Meyer and Maza's complaint that they were not awarded the supervisory position is discussed below as is Meyer's complaint that Shapiro told other staff members that she was leaving the CDC and Maza's complaint that the CDC was insensitive to the needs of Spanish speaking patients. Plaintiffs' allegations of isolated incidents of criticism or negative comments by Shapiro are also insufficient to describe the kind of unbearable work environment from which a reasonable employee would feel compelled to resign.

Accepting all of Mark, Meyer, and Maza's allegations as true, these allegations do not suffice to describe a work environment so unbearable that a reasonable person would feel compelled to resign. Even in a booming economy, such a litany of petty complaints would not drive a reasonable person away from a job marred only by the annoyances plaintiffs recite. This does not mean it was unreasonable for these three plaintiffs to tender their resignations in the hopes of securing more enjoyable employment elsewhere. It does, however, mean that these plaintiffs cannot properly characterize their resignations as constructive discharges.

■ The plaintiffs have all failed to show that their resignations amounted to constructive discharges. Even if the court were to accept plaintiffs' paltry allegations as giving rise to a claim of constructive discharge, the claims do not support an inference of discrimination based on age, gender or national origin. Plaintiffs make a broad unsupported charge that Shapiro felt threatened by mature educated women who might challenge his authority within the CDC. All three plaintiffs have alleged age discrimination without proffering evidence to suggest that the slights of which they complain were directed against them based on their status as persons older than 40 years. Meyer and Maza allege gender discrimination with no more support for their allegations than that both were members of the protected class based upon their female gender. Maza alleges discrimination based on national origin with no more evidence than her membership in a protected class based upon her birth in Cuba. Thus, even if plaintiffs could show constructive discharge, they cannot show an inference of discrimination based upon age, gender or national origin.

*Disparate Treatment*

■ Plaintiffs make several disparate treatment claims based upon a melange of age, sex, and national origin. The disparate treatment claims specific to sex and age are difficult to dissect out as plaintiffs bundle their disparate treatment claims together. Fortuitously, these age and sex discrimination claims are governed by the same legal standard and thus are easily addressed together. The legal standard

for discrimination under both title VII and the ADEA has been clearly established since *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas* plaintiff must first raise a prima facie case of discrimination. In order to make a prima facie case plaintiff must allege four elements: 1) membership in a protected class, 2) qualification for the employment, 3) occurrence of an adverse employment action, and 4) the existence of circumstances giving rise to an inference of discrimination. If a plaintiff makes a prima facie case, under *McDonnell Douglas'* burden shifting analysis the defendant must then articulate a legitimate non-discriminatory reason for its actions. If the defendant articulates such a reason, the burden then shifts back to the plaintiff to show that defendant's proffered reasons are pretextual and that the actions were truly motivated by discrimination.

██ Meyer's disparate treatment claim is primarily one for failure to promote. Meyer held the position of interim psychology director at the CDC. The CDC chose not to award Meyer the position of permanent supervisor of the psychology unit, awarding the job to Robert Broad instead. Meyer now alleges that the selection of a male for this post demonstrates sex discrimination. Meyer has difficulty satisfying any but the first prong of the *McDonnell Douglas* requirements for a prima facie case. The circumstances Meyer describes fail to create an inference of discrimination. Shapiro decided to award Meyer the post of interim coordinator less than one year before he decided not to grant her the position permanently. Even without considering the defendant's evidence suggesting inadequacies in Meyer's performance as interim coordinator, a reasonable factfinder would not infer that Shapiro suddenly developed a penchant for denying promotion to women or persons of greater years in that short time. Meyer fails to make a prima facie case and thus her claim cannot survive summary judg-ment. Even if this court were to accept that Meyer made a prima facie case of discrimination, her failure to rebut defendant's proffered business reasons for selecting Broad for the coordinator post defeats her claim. Defendant has offered evidence of discord within the CDC's psychology unit during Meyer's tenure at the helm and Meyer has failed to refute the arguments that she was not the most qualified candidate for the permanent position.

██ Maza too was denied the position of psychology supervisor and her disparate treatment claim is also largely one of failure to promote. Maza's failure to promote claim is even more tangled; alleging discrimination based on gender, age and national origin. For the same reasons as Meyer, Maza has difficulty making a prima facie case. Even if the court accepted Maza's allegations as giving rise to a prima facie case, her claim still fails because she does not adequately rebut the legitimate business reasons defendant cites. The promotion Maza sought would have required her to supervise the other psychologists in a manner which would promote the efficient and harmonious operation of the CDC. Defendant has articulated numerous legitimate reasons, including strained relations between Maza and the other psychologists, why Maza was not well suited to hold the supervisory position. Maza needed to refute these reasons in order for her claim to survive summary judgment.

██ The disparate treatment claim involves a few minor allegations beyond failure to promote. Meyer and Maza also allege that, as females, they were treated differently than Broad solely on account of gender. In conjunction with Broad's appointment as supervisor he was conferred the status of adjunct professor. The fact that plaintiffs were not made adjunct professors is not actionable. Plaintiffs were not similarly situated to Broadhe was a supervisor while they were staff psychologists. Thus, differences in status of academic appointment cannot be attributed to gender discrimination without more than

simply citing the different level of academic appointment. Plaintiffs further object that Broad's name was listed in the Hospital telephone directory with the title "PhD" while no such letters appeared after their names even though they too had earned this degree. In light of the fact that the directory for some years omitted Broad's name entirely and the directory only listed him as a PhD in a year when plaintiffs were not employed by the Hospital, any inference of gender discrimination is lacking.

*Hostile Environment*

■ Aside from the allegations of disparate treatment, two plaintiffs also raise a sex discrimination claim based on hostile environment. Plaintiffs Meyer and Maza have alleged that defendant engaged in sexual harassment in violation Title VII. Just as not all unpleasant working conditions give rise to constructive discharge, so too not all unpleasant work environments constitute a hostile environment. Although there is no equation into which all factors may be plugged to yield an answer of hostile or not hostile, the Supreme Court has provided ample guidance in resolving this question.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview.

*Harris v. Forklift Systems,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Plaintiffs' attempts to allege such a hostile environment are transparently thin. Robert Broad was made the psychology supervisor after the CDC decided Meyer should not continue to hold the coordinator's job. Plaintiffs ineffectively argue that this created both a hostile environment and grounds for constructive discharge.

> Shapiro told other staff members that he expected [Meyer] to resign. Having been stripped of all sense of respect and dignity among her peers, and working in a hostile climate, Meyer was left with no choice but to submit her resignation in what can only be described as a constructive discharge.

Pls.' Mem. of Law in Opp'n to Summ.J. at 9–7. Many employees are passed over for promotion or even demoted without deeming the slight so denuding of dignity as to preclude further employment. A supervisor's voiced speculations as to how long an employee will choose to remain may be indiscreet but do not create an oppressive an demeaning workplace. A reasonable person may not enjoy working in a subordinate position but such work assignment is not inherently hostile simply because a male was promoted to supervisor. At the summary judgment stage of a proceeding the time for relying on mere conclusory allegations is long past.

■ Meyer also alleges that on two occasions Shapiro commented on the appearance of female coworkers' chests. If true, Shapiro's comments were clearly inappropriate. However, Title VII cannot be wielded to redress every inappropriate comment simply because it is of a sexual nature and was uttered in a workplace. Two isolated inappropriate comments of a sexual nature do not create the kind of pervasive atmosphere constituting a hostile environment.

■ Maza alleges that Shapiro behaved in a sexually inappropriate manner on a few occasions. Maza charges that Shapiro tried to hug or kiss her without her consent at CDC parties. Even if true, as discussed above, Courts have required a severe or pervasive atmosphere. *See Harris v. Forklift Systems,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Maza does not allege any actions on Shapiro's part which would be objectively deemed lewd. A platonic hug or kiss at a party falls within the realm of culturally appropriate social behavior absent a showing that the particular recipient indicated the contact was unwelcome.

The defendant has argued that plaintiffs' failure to utilize the Hospital's complaint procedure disqualifies their sexual harassment claim. As plaintiffs' allegations are not sufficient to state a viable claim, the court need not reach this proffered defense.

The only defendant in this case is the Mount Sinai Hospital. Accepting as true all of plaintiffs' allegations regarding Arnold Shapiro and the atmosphere of the CDC, these allegations do not paint a picture of a hostile environment. Thus, as no liability exists, the court need not address whether the Hospital can be held liable for permitting the CDC to be managed in the fashion plaintiffs describe. As no actionable conduct occurred, it is irrelevant whether or not such conduct could be imputed to the Hospital.

*Breach of Contract*

■ The CDC provided services to many Medicaid beneficiaries. In order to receive payment from Medicaid, the CDC was required to submit certain forms commonly called Medicaid "overrides". The CDC interpreted Medicaid policy as allowing only a person holding a doctoral degree to sign the overrides. Each of the three plaintiffs had earned doctorates in psychology. The majority of the CDC employees, including the director, did not hold doctorates. The CDC practice was for non-doctoral staff who treated patients to fill out overrides and then leave them for signing by a member of the CDC staff who held a doctoral degree. Mark and Meyer questioned the legitimacy of this arrangement and refused to sign the override forms completed by other staff members.

Mark and Meyer argue that if they simply picked up a form completed by another staff member and blindly signed it, they would lack personal knowledge as to the accuracy of the information which would be submitted to the Medicaid program, and thus signing the forms would be conducive to fraud and therefor unethical. Mark and Meyer further contend that some forms might list non-psychiatric diagnoses such that signing the forms would constitute practice beyond the scope of their expertise. The New York State Medicaid Fraud Unit was apprized of the CDC practice and decided the situation did not merit further investigation. The fact that the Medicaid program did not deem the CDC's practice overly conducive to fraud and abuse does not, in and of itself, defeat plaintiffs' claim. Plaintiffs' claim fails because they have failed to introduce evidence as to how the CDC override-signing arrangement prevented them from ensuring the accuracy of the forms prior to signing. Plaintiffs offer no evidence that the CDC required them to sign forms in ignorance or in any way prevented them from ascertaining the accuracy of the forms. Plaintiffs also fail to buttress their scope of practice argument with evidence. Plaintiffs have not introduced evidence of an incidence in which properly evaluating the accuracy of a form completed by a speech therapist or a social worker fell beyond the ken of a psychologist employed at a center for treating communications disorders.

Plaintiffs merely rest on the conclusory allegations that they were required to sign forms for patients whom they did not personally treat or whose primary problems fell outside of the field of psychology. Without presenting evidence that they were somehow denied access to the patients' written treatment records, barred from discussing the form with the staff member who completed it, or in any other way impeded from gathering necessary information before lending their signatures to confirm the accuracy of the information to be submitted, plaintiffs fail to demonstrate how their professional ethics might be comprised. Clearly engaging in Medicaid fraud would constitute a breach of professional ethics and might breach an employment contract. However, the delivery of health care is a complex process which usually employs a team treatment approach and often requires delegation of

various tasks. The team coordinator cannot always enjoy direct personal knowledge of every aspect of a patient's care and must often rely on information provided by other members of the team. Certainly a treating physician may rely on another staff member's notation in the medical record that a particular therapeutic modality was administered without directly observing such therapy. Without further evidence to show how the policy of the CDC prevented plaintiffs from ensuring the accuracy of an override form prior to signing, plaintiffs have failed to present sufficient evidence to allow the breach of contract claim to go forward.

At the summary judgment stage plaintiffs may not rely on the mere conclusory allegation that the CDC override signing policy violated professional ethics and thereby constituted a breach of an employment contract.

> The litigant opposing summary judgment, therefore, may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial. Rather, he must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful.

*Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (internal citations omitted). Thus, in order to survive summary judgment, plaintiffs were required to present some significant evidence to show how the CDC policy was improper. Vigorous assertion alone does not suffice. Since plaintiffs have failed to state an employment policy requiring them to violate their professional ethics this court need not resolve whether or not New York law recognizes an exception to the employment at will doctrine based upon upholding the ethical rules of the psychology profession.

### National Origin Discrimination

One plaintiff, Maza, was born in Cuba and alleges that defendant engaged in unlawful discrimination against her based on national origin. Maza's complaint that she was denied promotion to a supervisory position was discussed above. On the three occasions when Maza sought a supervisory position each time the job was awarded to a non-latino candidate. Maza's allegations fail to offer more than conclusory allegations to show that she was qualified for the position or that considerations of age, gender, or national origin played any role in the CDC's promotion determinations.

■ A large proportion of the CDC's patient population either speaks Spanish exclusively or is bilingual in Spanish and English. Plaintiffs state that "[Maza's] claim of national origin discrimination rests on the Hospital's insensitivity to its Spanish-speaking patient population." Pls.' Mem. of Law in Opp'n to Summ.J. at 27. Maza claims that the CDC's atmosphere of insensitivity to its Spanish speaking patient population created a hostile environment in which to work. Maza alleges an inadequacy of Spanish speaking staff members and haphazard access to trained translators. As a fluent speaker of Spanish, Maza did not require a translator in order to converse with Spanish speaking patients. Thus, any shortage of translators would have detracted from her ability to provide suitable treatment to Spanish speaking patients less than other staff members. Maza stated that she had lobbied for the CDC to hire more Spanish speaking staff members. Maza has never claimed that the CDC's general hiring policy discriminated against applicants who could speak Spanish. Maza does not suggest that she opposed a discriminatory policy of the CDC or in any other way sought to exercise rights protected by Title VII. Thus even if Maza could show that her denial of the supervisory position or any other CDC action constituted an adverse employment action, absent engaging in a protected activity, Maza cannot make a valid retaliation claim. *See generally Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276 (2d Cir.1998) (holding that a retaliation claim requires a plaintiff to show that she: 1)engaged in an

activity protected by Title VII; 2)the employer knew of the activity; 3)the employer took an adverse employment action against her; 4)a causal connection existed between the protected activity and the adverse employment action). Maza has not raised a valid complaint for national origin discrimination based on disparate treatment, hostile environment, retaliation, constructive discharge or any other theory.

## CONCLUSION

Plaintiffs have presented rather weak claims of age discrimination, gender discrimination and national origin discrimination. Each of plaintiffs' discrimination claims must stand on its own. Thus, bundling three weak claims does not somehow create one prevailing claim. Allegations which fall short of showing age discrimination, coupled with allegations which fall short of showing gender discrimination, joined by allegations which fall short of showing national origin discrimination cannot be somehow synergistically totaled to add up to one prevailing discrimination claim. Plaintiffs' breach of contract and constructive discharge claims are also unsupported. Because each of plaintiffs' individual claims falls short of the required threshold to survive summary judgment, plaintiffs' entire case must be dismissed.

Considering all facts in the light most favorable to the plaintiffs, plaintiffs' allegations are not sufficient to survive summary judgment. Thus, for the reasons outlined above, defendant's motion for summary judgment was granted.